
EXHIBIT A

# MASTER SERVICES AGREEMENT

**THIS MASTER SERVICES AGREEMENT** ("Agreement") made effective this 29th day of October, 2021 (the "Effective Date") is by and between Dualboot Partners a North Carolina limited liability company (herein "Company"), and Press Sports with an address of 470 E Paces Ferry Road, Atlanta GA 30305 ("Client").

## RECITALS

The Company operates a business that builds software platforms and digital strategy services for a variety of clients in various industries;

The Client desires to hire Company and Company desires to accept and perform such services, on the terms and subject to the conditions set forth in this Agreement.

## AGREEMENT

NOW THEREFORE, for and in consideration of payment, mutual covenants, promises, representations, and releases herein contained, the receipt and sufficiency of which is hereby acknowledged, the Company and Client agree as follows:

1. <u>Services</u>. Company agrees to perform services (the "Services") for Client as detailed in one or more project descriptions (each a "Statement of Work). Company shall, in its sole discretion, determine the method, details and means of performing the Services and providing any deliverables (the "Deliverables"), subject to the specifications set forth in the applicable Statement of Work. Each Statement of Work will expressly refer to this agreement. In an event of disagreement or conflict between any term of this Agreement and any Statement of work, the terms of the Statement of Work shall control.

2. <u>Relationship</u>. Company and Client expressly agree and acknowledge that the relationship created by this Agreement is one of Independent Contractor. Nothing in this Agreement shall be deemed or construed by the Parties or any third party as creating the relationship of principal and agent, partnership, or joint venture between the Parties. Unless otherwise stated in the applicable Statement of Work, Company shall have sole discretion over the identity of its personnel used to provide the Services, provided that Company shall ensure that the personnel are in all cases suitably qualified and experienced.

3. <u>Cooperation</u>. Each Statement of Work includes a proposed project schedule estimate, and Company and Client hereby agree to provide resources in a timely fashion to develop and deliver any deliverables set forth in the Statement of Work in accordance with the project schedule estimate. Client shall make available to Company a designated representative ("Client's Representative"), who will be identified as such in the applicable Statement of Work, shall be authorized to make binding decisions for Client regarding the obligations which are the subject of this Agreement, and shall perform or have performed other duties and requirements of Client as set forth in this Agreement or in an applicable Statement of Work. Client understands that Company shall rely upon Client's

1

Representative as having the authority to make binding decisions on behalf of the Client. Client shall provide Company with timely access to any Client assets, including Client's intellectual property, needed for Company to perform the Services (the "Client Materials"), and Client acknowledges and agrees that delays in cooperation by Client will likely result in delays to the project schedule and delivery dates and may impact budget. Client will be responsible for ensuring that all such Client Materials are accurate and complete. Company shall not be responsible for securing any necessary Intellectual Property Rights that may be owned or retained by third parties unless the applicable Statement of Work expressly makes Company responsible for securing those intellectual property rights in which case such obligation is subject to the availability of those resources on terms approved by Client. Unless otherwise agreed in writing by the parties, Client shall have sole responsibility for acquiring and maintaining its own technology environment, including but not limited to PC's, operating systems, databases, servers, Internet access, networks, and hosting.

4.    Term and Termination. The Term will begin on the Effective Date and will remain in force until terminated. Either party may terminate for convenience this Agreement or a statement of work or reduce the then current team size as determined by the Company in good faith, under a statement of work with forty five (45) days' written notice (email is acceptable) to the other party. All Client termination or resource reduction notices will be emailed to daniel.delacruz@dualboot.com  The Company may immediately terminate this Agreement or a Statement of Work upon material breach by the Client. Material breach shall mean only (a) late payment by the Client; (b) Client is the subject of a voluntary petition in bankruptcy or any voluntary proceeding relating to insolvency, receivership, liquidation, or composition for the benefit of creditors; or (c) the Client becomes the subject of an involuntary petition in bankruptcy or any involuntary proceeding relating to insolvency, receivership, liquidation, or composition for the benefit of creditors, if such petition or proceeding is not dismissed within sixty (60) days of filing. Upon receipt of a notice of termination, the parties shall cooperate to wind down all activities with respect to any relevant Statements of Work in an orderly manner, as soon as practical, and based upon an agreed upon schedule. Upon termination of this Agreement or Statement of Work, Client shall be obligated to pay Company for all Services rendered pursuant to any outstanding Statements of Work through the effective date of such termination, and Company shall then transfer deliverables in the state of completion to Client. Each party shall immediately cease all use of and shall return to the other party promptly all Confidential Information and materials of such other party and all copies, portions and abstracts thereof, that are in its possession or under its control, other than any materials for which Client has paid. Company shall deliver to Client such portion of any deliverables that are complete upon payment of all fees due for such Services.

5.    Compensation.
   a.    *Fees*. Client will pay Company fees and other compensation as applicable as provided in the applicable Statement of Work.
   b.    *Invoices and Payment*. Company shall provide invoices to Client every month. All invoices shall be payable net fifteen (15) days from receipt by Client. Late payments shall accrue interest at a rate of the lesser of one and one-half percent (1.5%) per month or the highest rate allowed by law. If Company employs any legal process to recover any amount due and payable from Client hereunder,

2

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

Client shall pay all costs of collection and reasonable attorneys' fees. Further, upon Client's failure to pay an invoice on time, the agreed upon schedule in the Statement of Work shall be voidable at Company's sole discretion, regardless of whether Company ceases or suspends performance. Also, Company shall have the option of changing the terms of the original schedule, and before work on any Deliverables recommences, Client shall bring its account current, and agree to the proposed new schedule.

c. *Expenses*. Client shall reimburse Company for expenses that have been pre-approved in writing. Company shall provide appropriate documentation (e.g., receipts or invoices) for reimbursable expenses.

6. <u>Taxes</u>. All expenses, fees and other payables to Company hereunder do not include any use, sales, value added or other applicable taxes, duties or tariffs, payment of which will be the sole responsibility of Client (excluding any taxes based on Company's net income). Client will immediately reimburse Company for any such amounts that Company pays on Client's behalf.

7. <u>Delivery and Acceptance</u>. Company will deliver the Deliverables to Client in accordance with the details set forth in the applicable Statement of Work. Client will be deemed to have accepted the Deliverables included in a Statement of Work upon productive use of any portion of such Deliverables or after the period of ten (10) days immediately following an invoice for which Client has not delivered to the Company a written notice of errors related to the Deliverables.

8. <u>Confidentiality</u>. During the course of performance of this Agreement, each party may disclose to the other certain confidential information. Each party shall hold the other party's Confidential Information in confidence and shall use its best efforts to protect it. Each party shall not disclose the other party's Confidential Information to any third party, and shall use it for the sole purpose of performing under this Agreement, except to those of its employees and subcontractors who have a bona fide need to know such Confidential Information for the performance or enforcement of this Agreement; provided that each such employee and subcontractor is bound by a written agreement that contains use and nondisclosure consistent with the terms set forth in this section. At the conclusion of each Statement of Work, each party shall either return the other's Confidential Information in its possession (including all copies) or shall, at the disclosing party's direction, destroy the other party's Confidential Information (including all copies) and confirm its destruction to the disclosing party. "Confidential Information" means any information (either oral, written or digital) provided or prepared by a party ("Disclosing Party") that is provided to, or obtained by the other party (including any director, officer, employee, agent, or representative) ("Receiving Party") including but not limited to, that which relates to research, product plans, products, services, clients, markets, software, developments, inventions, processes, designs, drawings, engineering, technical data, know-how, hardware configuration information, marketing or finances of the disclosing party. The term "Confidential Information" shall not include any information which: (a) is in the public domain at the time of disclosure or enters the public domain following disclosure through no fault of the Receiving Party, (b) the Receiving Party can demonstrate as already in its possession prior to disclosure hereunder or is subsequently disclosed to the Receiving Party

3

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

with no obligation of confidentiality by a third party having the right to disclose it or (c) is independently developed by the Receiving Party without using the Disclosing Party's Confidential Information. Nothing herein shall be construed to prevent or in any way limit Company from using general knowledge, skill, and expertise acquired in the performance of this Agreement in any current or subsequent endeavors and Client shall have no interest in such endeavors. The following obligations will not restrict either party from disclosing the other party's Confidential Information: (i) pursuant to the order or requirement of an administrative agency, court, or other governmental body, provided that the party required to make such a disclosure gives reasonable notice to the other party to contest such order or requirement; (ii) to its financial advisors or legal; (iii) as required under applicable securities regulations; and (iv) subject to customary restrictions, to present or future providers of venture capital and/or potential private investors in or acquirers of such party.

9.     Ownership of Intellectual Property. The Company acknowledges and agrees that any work prepared by the Company under this Agreement shall be considered the exclusive property of the Client, conditioned upon full payment by the Client. The Company agrees that Client shall retain all title and rights to Company's work performed as part of the Services and any and all deliverables (including, without limitation patent rights, copyrights, trademarks, and other intellectual property rights) or other legal interest in all data, analyses, graphs, reports, formulae, know-how, patent rights, copyrights, trade secrets, physical property, or other material and intellectual property prepared, procured, or produced, in the rendition of the Services.

10.     Non-solicitation. During the term of this Agreement and for a period of thirty-six (36) months thereafter, Client shall not, directly or indirectly, employ, induce or attempt to induce any current or former employees or contractors of the Company to leave the employ of the Company, to work directly or indirectly for the Client, or otherwise interfere with the relationship of any employees, independent contractors, suppliers or vendors of the Company. As used herein the word "employ" shall include, without limitation, the soliciting of a person who is an independent contractor of the Company including former employees or contractors of the Company. Client agrees that any actual or threatened breach of this Section 10 will result in irreparable harm to Company for which there is no adequate remedy at law. In the event of any such breach, Company shall be entitled to equitable relief, including injunctive relief, in addition to all other remedies available at law or in equity. If Client interferes with an employee or contractor of Company, then the Client shall pay as liquidated damages but not as a penalty the greater of two (2) times the hired employee's annual salary or One Hundred Fifty Thousand Dollars ($150,000), in a lump sum payment within two (2) weeks of the date upon which the employee begins a new employment relationship. Liquidated damages under this paragraph shall not limit or impair any other remedies that Company may seek for breach of this paragraph or this Agreement.

11.     Publicity. Except as provided herein, no press release, announcement, publication, or other use of the other party's insignia logos, trademarks, tradenames or service marks (collectively, the "Marks") shall be made by either party without the other party's prior approval. Notwithstanding the foregoing, and consistent with the terms of this Agreement, including Section 8, Company may list Client as a Client of Company in the Company

4

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

marketing materials, such as representative client lists, website, case studies, printed and digital sales material. Company may also include a link to Client's web site on Company's web site. Client agrees to make reasonable efforts to include a credit to Company for performance of Services in related publicity materials and marketing activity.

12. Good Faith & Non-Disparagement. Parties agree they will generally work together in good faith and will not disparage or encourage others to disparage the other party. For purposes of this agreement, the term disparage includes without limitation comments or statements made in any matter or medium in the press and/or the media about the a party which would adversely affect any manner of the conduct of the business of the other party, without limitations to a party's business plans or prospects or the business reputation of a party.

13. Indemnification. Client agrees to defend, indemnify and hold harmless Company, its subsidiaries, affiliates and other related companies, and its and their principals, directors, officers, employees and agents from and against any and all liabilities, penalties, claims, fines, demands, suits and causes of action of any nature whatsoever, and any and all damages, costs and expenses sustained or incurred (including cost of defense, settlement and reasonable attorneys' fees) asserted by or on behalf of any person or entity relating to, arising out of or concerning a claim by a third party of infringement by Client Materials used in the Services.

14. Warranties and Disclaimers.

    a. *Warranties*. Each party represents and warrants to the other party that (i) it is a legal entity in good standing, (ii) it is authorized to carry on its business and to perform the obligations set forth in this Agreement, (iii) it will perform its obligations under this Agreement in compliance with applicable law, (iv) this Agreement is valid, binding and enforceable against it (subject to applicable principles of equity and bankruptcy and insolvency laws), and (v) it has the power and full ability to grant the rights granted to the other party and their permitted assigns herein. Client warrants that it owns or has sufficient rights to use and to authorize Company to use the Client Materials and the Client Materials do not infringe the intellectual property rights of any third party.

    b. *Warranty Disclaimer*. THE WARRANTIES SET FORTH IN SECTION 13(a) ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. EXCEPT WHEN OTHERWISE STATED IN WRITING THE MATERIALS PRODUCED UNDER THE TERMS OF THIS AGREEMENT ARE PROVIDED TO CLIENT "AS IS," THAT IS, WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESSED OR IMPLIED.

    c. *Damages Disclaimer*. THE PARTIES AGREE THAT NEITHER PARTY'S LIABILITY FOR DAMAGES FROM ANY CAUSE OF ACTION WHATSOEVER, REGARDLESS OF THE FORM OF ACTION, WILL EXCEED THE FEES PAID OR PAYABLE BY CLIENT PURSUANT TO AN APPLICABLE STATEMENT OF WORK UNDER THIS AGREEMENT FOR

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

THE PREVIOUS TWELVE (12) MONTHS. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR LOST PROFITS OR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES OF ANY NATURE WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DAMAGES ARISING FROM LOSS OF USE OF ANY SOFTWARE OR HARDWARE, COSTS OF PROCUREMENT OF SUBSTITUTE PRODUCTS OR SERVICES, LOST DATA, DATA BREACHES, LOST PROFITS OR REVENUE, OR FOR ANY CLAIM OR DEMAND BY ANY THIRD PERSON, ARISING OUT OF OR RELATED TO THE AGREEMENT OR THE PERFORMANCE OR BREACH THEREOF, EVEN IF ADVISED OF THIS POSSIBILITY.

15.     <u>Force Majeure</u>. Neither party shall be responsible for any failure to perform, or delay in performing any of its obligations under this Agreement, where and to the extent that such a failure or delay results from causes outside the control of such party. Such causes shall include, without limitation, delays caused by the other party, acts of God or of the public enemy, acts of the government in its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, freight embargoes, strikes, civil commotion, or the like.

16.     <u>Assignment</u>. Notwithstanding the foregoing, Company may assign this Agreement in connection with a sale or other disposition of substantially all of the assets of the Company.

17.     <u>Entire Agreement</u>. This Agreement, including all Statements of Work, constitutes the entire understanding between the parties, superseding all previous negotiations, understandings, and agreements. An amendment or modification to this Agreement shall be effective only if in writing and signed by all parties.

18.     <u>Counterparts</u>. This Agreement may be executed in one or more original, electronic or facsimile counterparts, each of which shall be deemed an original, and all of which together shall constitute one agreement. Execution of a facsimile or electronic copy shall have the same force and effect as execution of an original, and a facsimile or electronic signature shall be deemed an original and valid signature.

19.     <u>Headings</u>. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

20.     <u>Severability</u>. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the maximum extent possible.

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

21.     <u>Survival</u>. The provisions of Sections 4 through 14 shall survive the expiration or termination of this Agreement. All other provisions of this Agreement, including any Statements of Work which by their terms or import are intended to survive such expiration or termination, shall survive.

22.     <u>Waiver</u>. Failure by a party to require performance of any provision(s) shall not affect that party's right to require subsequent performance at any time thereafter, nor shall a waiver of any breach or default of this Agreement constitute a waiver of any subsequent breach or default or a waiver of the provision itself.

23.     <u>Notices</u>. All notices, requests, demands, instructions, or other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given upon delivery, if delivered personally, upon confirmed receipt if by e-mail, or if mailed first-class, postage prepaid, registered, or certified mail, return receipt requested, shall be deemed to have been given seventy-two (72) hours after postmark, if addressed to the other party at the addresses as set forth on the signature page below. Either party hereto may change the address to which such communications are to be directed by giving written notice to the other party hereto of such change. Additionally, a copy of all notices from Client to Company shall be emailed to daniel.delacruz@dualbootpartners.com.

24.     <u>Governing Law and Venue</u>. This Agreement will be governed by and interpreted according to the law of the State of North Carolina. In the event of any disagreement regarding the interpretation, force and effect of this Agreement, the parties shall discuss the dispute within seven (7) days of delivery of written notice of the disagreement by one party to the other. The parties agree to attempt to resolve such disagreement in good faith within thirty (30) days of such written notice. If after thirty (30) days, the parties are unable to reach agreement, either party shall be entitled to submit such disagreement to an arbitrator or panel of arbitrators, mutually agreed upon by the parties, in the City of Charlotte, North Carolina, and whose decision may be entered in any competent court with valid jurisdiction. Any decision by the arbitrator or panel of arbitrators shall be binding on the Parties. The costs of the arbitration, including the reasonable fees and expenses of attorneys and arbitrators, shall be paid by the Party, or the Parties, as directed in the sole discretion of the arbitrator(s).

*Signature page follows.*

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized representatives as of the dates set forth below their respective signatures.

**Dualboot Partners LLC**

By: Daniel DelaCruz, Principal

Date: 10 / 30 / 2021

Address: 5540 Centerview Dr Ste 204, #24754

Raleigh, North Carolina 27606-8012

**Client: Press Sports**

*Conrad Cornell*

By: Conrad Cornell

Date: 10 / 29 / 2021

Address: 470 East Paces Ferry Rd

Atlanta, GA 30305

8



October 29, 2021

# Statement of Work

# Press Sports

This Statement of Work *("Statement of Work")* is pursuant to the terms and conditions of the Master Services Agreement dated October 29, 2021 by and between Dualboot Partners, a North Carolina LLC with offices at 5540 Centerview Dr. Ste 204, #24754, Raleigh, North Carolina 27606-8012 (the "Company"), and Press Sports , with offices at 470 E Paces Ferry Road, Atlanta GA 30305 ("Client"). This Statement of Work is made and entered as of October 29, 2021 (the "Statement of Work Effective Date").

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

# Summary of Work

Company will provide consultation and services to the Client on a time and materials basis. Company and Client agree to share responsibility for keeping the project on schedule and on budget. Changes to this Statement of Work may increase the cost of this project and will be billed on a time and material basis.

Project Objective:

- Provide technical product and product management leadership to enhance existing product.
- As required, implement and enhance DevOps and QA Automation.
- Provide ongoing maintenance and support for the Product.
- Improve and build new features for Product as directed by Client.

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

# Delivery Methodology

| Deliverables | Description |
|---|---|
| Product Backlog | The Company will collaborate with Client to identify a prioritized backlog of epics, user stories and acceptance criteria that will serve as the basis for the design and development of the product. The Product Backlog will be maintained and managed by the Product Team. |
| Product Design | Utilizing the output of Product Backlog, the Company will collaborate with Client to design the product user experience (UX).<br><br>Leveraging the output of the UX design, the Company will design a graphical user interface (UI design) for the Product in collaboration with the Client.<br><br>Clickable prototypes based UX and UI designs will be delivered via Invision. |
| Product Development Sprints | The Company will develop the Product utilizing the Product Backlog and the Product Design. Development will be organized into sprints and managed by the Company. Sprints will include product management, design, engineering, QA and other Company resources as required. |
| Product Development Deployments | The Company will deploy the Product codebase to a cloud environment so that the Product is available to end users. End users may be internal testers or actual customers depending on the maturity of the Product and the operating plan of the Client. |
| Support | The Company will support the technical needs of the product. Support will not include call center but will include a prioritized list of items identified and approved by Client's client team. |

The deliverables above, provided by the Company, will produce functional software features that collectively build and enhance the Client's Product. The specific feature scope designed and developed by the Company will be determined based on the needs of the Client in collaboration and consultation with Client.

# Team

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

Company's team is comprised of Product and engineering, as follows:

| Functional Area | Description | Cost |
|---|---|---|
| Product Director | Provides strategic direction and management for the Delivery team. This includes the role of CTO and Product Management. | $200/hr |
| Designers | Develops the brand, look and feel, user experience and visual graphics/design. Example roles include:<br><br>● User Experience Designer (UX)<br>● User Interface Designer (UI) | $75/hr |
| Developers | Responsible for coding, testing and implementing the Product. Example Developer roles include:<br><br>● Lead Developer<br>● Web Developer<br>● Front-End Developer<br>● HTML/CSS Developer<br>● Mobile Developer<br>● Test Developer | $75/hr |

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

## Estimated Term & Budget

| Term | Estimated Cost |
|------|----------------|
| Development - 2.5 Resources | *~$30,000 per month* |

## Deferred Compensation

Dualboot Partners will defer twenty (20%) of all billings whereas eighty five percent (80%) of a given invoice amount will be cash payable by Client to Company and the remaining unpaid balance (20%) will be considered Deferred Billings ("Deferred Billings")  -- all Deferred Billings will be converted and immediately vested as the Purchase Amount of the Deferred Compensation Agreement found in Exhibit A of this Agreement.

On a quarterly basis the Company and Client will meet and mutually agree on the go-forward Valuation Cap of the Deferred Compensation Agreement (found in Exhibit A). Changes to the Valuation Cap shall not impact the Valuation Cap for Deferred Billings already invoiced. Additionally, for fifteen (15) days after an invoice is issued to the Client, the Client in their sole discretion shall have the option to pay 100% of the invoice in cash and no deferred balance shall be accrued for that invoice.

## Risk Mitigation

At a minimum, the Company and Client will communicate engagement risks during weekly status meetings. The Company and Client will work together to minimize each engagement risk.

Deviations to the project plan often result in additional costs and frequently delay product launch.

## Deposit

Client agrees to pay a deposit of $15,000 prior to the Company starting the engagement. The deposit will be credited to the last months' invoice.

## Payments

Each month the Company will send an invoice for the previous month's work and any incidental expenses. All invoices will include a time & materials break down.

## Terms & Conditions

In addition to the Master Services Agreement, this Statement of Work includes the following terms & conditions:

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

- No hosting or other operating expenses (e.g., computers, software, etc.) will be paid for by the Company. If the Company does pay for such expenses, the Client will reimburse the Company as part of the monthly invoicing process defined above.

- Both parties acknowledge all dates or estimates are targets; there are innumerable factors that can impact dates and estimates.

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

# Statement of Work Signature

IN WITNESS WHEREOF, the parties have caused this Statement of Work to be executed as of the Statement of Work Effective Date by their duly authorized representatives.

**Company**

_(signature)_

Signature

Daniel DelaCruz

Name

Principal

Title

10 / 30 / 2021

Date

**Client**

_Conrad Cornell_

Signature

10 / 29 / 2021

Name

Co-founder, CEO

Title

10 / 29 / 2021

Date

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

# PRESS SPORTS APP, INC.

### SAFE
### (Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the services by Dualboot Partners (the "**Investor**") of the total Deferred Balances as calculated per the Statement of Work and Master Services Agreement dated October 29, 2021(the "**Purchase Amount**"), Press Sports App, Inc., a Delaware corporation (the "**Company**"), issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms described below.

The "**Post-Money Valuation Cap**" is $15,000,000.

See **Section 2** for certain additional defined terms.

1. *Events*

(a) **Equity Financing**. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.

In connection with the automatic conversion of this Safe into shares of Standard Preferred Stock or Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor.

(b) **Liquidity Event**.  If there is a Liquidity Event before the termination of this Safe, this Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the "**Cash-Out Amount**") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**").  If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 1(d).

(c) **Dissolution Event**.  If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds

equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

(d) **Liquidation Priority**.  In a Liquidity Event or Dissolution Event, this Safe is intended to operate like standard non-participating Preferred Stock.  The Investor's right to receive its Cash-Out Amount is:

(i)  Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);

(ii)  On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and

(iii)  Senior to payments for Common Stock.

The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and other Safes and/or Preferred Stock who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent such payments are Cash-Out Amounts or similar liquidation preferences).

(e) **Termination**.  This Safe will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this Safe) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the Investor pursuant to the automatic conversion of this Safe under Section 1(a); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b) or Section 1(c).

2.  *Definitions*

"**Affiliate**" means (i) means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including, without limitation, any general partner, managing member, officer, director or trustee of such Person, or any venture capital fund or registered investment company now or hereafter existing that is controlled by one or more general partners, managing members or investment advisers of, or shares the same management company or investment adviser with, such Person; (ii) any entity that receives any services from Investor or subsidiary thereof; (iii) any investment fund or similar vehicle in respect of which any of the foregoing plays a material management role; (iv) any other entity in any manner affiliated or associated with any of the foregoing which entity uses the Overline trademark or tradename; (v) any other entity generally considered a constituent part of the collection of entities commonly referred to as Overline, Overline Investor Group; and (vi) any predecessor or successor entities to any of the foregoing.

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

"**Company Capitalization**" is calculated as of immediately prior to the Equity Financing and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all Converting Securities;
- Includes all (i) issued and outstanding Options and (ii) Promised Options; and
- Includes the Unissued Option Pool, except that any increase to the Unissued Option Pool in connection with the Equity Financing shall only be included to the extent that the number of Promised Options exceeds the Unissued Option Pool prior to such increase.

"**Converting Securities**" includes this Safe and other convertible securities issued by the Company, including but not limited to: (i) other Safes; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

"**Direct Listing**" means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing shall not be deemed to be an underwritten offering and shall not involve any underwriting services.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Dividend Amount**" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Liquidity Price (treating the dividend date as a Liquidity Event solely for purposes of calculating such Liquidity Price).

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation, for an aggregate gross purchase price paid to the Company of no less than $5,000,000, not including (i) the Purchase Amount of this Safe or the other Safes and (ii) the purchase amount or balance of any other Safes or convertible promissory notes then issued and outstanding in each case that convert into such Preferred Stock in such financing.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event, and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;
- Includes all Converting Securities, **other than** any Safes and other convertible securities (including without limitation shares of Preferred Stock) where the holders of such securities are receiving Cash-Out Amounts or similar liquidation preference payments in lieu of Conversion Amounts or similar "as-converted" payments; and
- Excludes the Unissued Option Pool.

"**Liquidity Event**" means a Change of Control, a Direct Listing or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Liquidity Capitalization.

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

"**Options**" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet or letter of intent for the Equity Financing or Liquidity Event, as applicable (or the initial closing of the Equity Financing or consummation of the Liquidity Event, if there is no term sheet or letter of intent), (ii) in the case of an Equity Financing, treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share, or (iii) in the case of a Liquidity Event, treated as outstanding Options in the calculation of the distribution of the Proceeds.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations. References to "this Safe" mean this specific instrument.

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the initial conversion price for purposes of price-based anti-dilution protection, which will equal the Safe Price; and (ii) the basis for any dividend rights, which will be based on the Safe Price.

"**Safe Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

3. ***Company Representations***

(a) The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b) The execution, delivery and performance by the Company of this Safe is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to section 3(d)). This Safe constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. To its knowledge, the Company is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c) The performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

(d)  No consents or approvals are required in connection with the performance of this Safe, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)  To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4.  *Investor Representations*

(a)  The Investor has full legal capacity, power and authority to execute and deliver this Safe and to perform its obligations hereunder. This Safe constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)  The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of an Equity Financing, the Company may void this Safe and return the Purchase Amount. The Investor has been advised that this Safe and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this Safe and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

5.  *Miscellaneous*

(a)  Any provision of this Safe may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the majority-in-interest of all then-outstanding Safes with the same "Post-Money Valuation Cap" and "Discount Rate" as this Safe (and Safes lacking one or both of such terms will be considered to be the same with respect to such term(s)), *provided that* with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, (B) the consent of the Investor and each holder of such Safes must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "Majority-in-interest" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b)  Any notice required or permitted by this Safe will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)  The Investor is not entitled, as a holder of this Safe, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this Safe be construed to confer on the Investor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 1.  However, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Safe is outstanding, the Company will pay the Dividend Amount to the Investor at the same time.

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

(d)  Neither this Safe nor the rights in this Safe are transferable or assignable, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this Safe and/or its rights may be assigned without the Company's consent by the Investor (i) to the Investor's estate, heirs, executors, administrators, guardians and/or successors in the event of Investor's death or disability, or (ii) to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this Safe in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)  In the event any one or more of the provisions of this Safe is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Safe operate or would prospectively operate to invalidate this Safe, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Safe and the remaining provisions of this Safe will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)  All rights and obligations hereunder will be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions of such jurisdiction.

(g)  The parties acknowledge and agree that for United States federal and state income tax purposes this Safe is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended.  Accordingly, the parties agree to treat this Safe consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

(*Signature page follows*)

Doc ID: 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac

IN WITNESS WHEREOF, the undersigned have caused this Safe to be duly executed and delivered.

**COMPANY:**

**PRESS SPORTS APP, INC.**

By: *Conrad Cornell*
Name: Conrad Cornell
Title: Chief Executive Officer

Address: 470 East Paces Ferry Rd
         Atlanta, GA 30305

Email: conrad@presssportsapp.com

**INVESTOR:**

**Dualboot Partners LLC**
**By the Daniel DelaCruz, its Principal**

By: _____
Name: Daniel DelaCruz
Title: Principal

Address: 5540 Centerview Dr Ste 204,
#24754, Raleigh, North Carolina
27606-8012

Email: daniel.delacruz@dualbootpartners.com



Audit Trail

| | |
|---|---|
| **TITLE** | Press Sports and DBP MSA and SOW October 2021 |
| **FILE NAME** | Press Sports Dualboot MSA (1).docx and 2 others |
| **DOCUMENT ID** | 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

**SENT**

**10 / 29 / 2021**
22:36:21 UTC

Sent for signature to Conrad Cornell
(conrad@presssportsapp.com) and Daniel DelaCruz
(daniel.delacruz@dualbootpartners.com) from
daniel.delacruz@dualbootpartners.com
IP: 73.224.195.189

**VIEWED**

**10 / 29 / 2021**
22:51:34 UTC

Viewed by Conrad Cornell (conrad@presssportsapp.com)
IP: 166.205.218.26

**SIGNED**

**10 / 29 / 2021**
22:54:41 UTC

Signed by Conrad Cornell (conrad@presssportsapp.com)
IP: 166.205.218.26

**VIEWED**

**10 / 30 / 2021**
11:26:55 UTC

Viewed by Daniel DelaCruz
(daniel.delacruz@dualbootpartners.com)
IP: 73.224.195.189

Powered by ▼ HELLOSIGN


| | |
|---|---|
| **TITLE** | Press Sports and DBP MSA and SOW October 2021 |
| **FILE NAME** | Press Sports Dualboot MSA (1).docx and 2 others |
| **DOCUMENT ID** | 9816f85d6aa2654fe871fad10fdb04bfd6acb3ac |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| SIGNED | **10 / 30 / 2021**<br>11:27:47 UTC | Signed by Daniel DelaCruz<br>(daniel.delacruz@dualbootpartners.com)<br>IP: 73.224.195.189 |
| COMPLETED | **10 / 30 / 2021**<br>11:27:47 UTC | The document has been completed. |